Inc. et al. Oral argument not to exceed 15 minutes per side. Mr. Trombley, you may proceed for the appellant. Thank you. May it please the court, my name is Logan Trombley. I represent Relator Appellant USN4U LLC. May it please be reserved 5 minutes for rebuttal. So, Relator filed a P10 complaint in 2017 seeking to expose Wolf Creek Federal Services' scheme to defraud the United States government at the NASA Glenn Research Center. The Relator alleged in this complaint that Wolf Creek's management and its employees were conspiring to overbill the government for labor costs. The scheme itself is pretty simple. Wolf Creek prepares a false cost estimate for the inflated labor hours for a job. NASA relies on the false cost estimate and awards Wolf Creek a firm fixed price equal to that false cost estimate. Wolf Creek employees then do the job, but report false labor hours to Wolf Creek in an amount equal to the inflated labor hours in the false cost estimate. Wolf Creek then invoices NASA, and then NASA pays an amount equal to the firm fixed price. Thus, NASA, in this roundabout way, reimburses Wolf Creek for its employees' inflated labor hours. In short, Wolf Creek regularly fraudulently infuses with its false cost estimates NASA to award its firm fixed prices amounts significantly higher than the truthful cost. After two years of investigation, the Department of Justice claimed to intervene in this case, as it typically does for the vast majority of P10 cases, since the DOJ does not have the resources to pursue all these cases. But not to be deterred, they were later elected to pursue this matter on the government's behalf, and served the original complaint on Wolf Creek. Wolf Creek moved to dismiss, but Sovereign later amended its complaint to make these issues rarer. Now, since the original complaint was filed, Wolf Creek continued its scheme, but Sovereign later used new false cost estimates as representative examples, and amended its complaint. Yet again, Wolf Creek moved to dismiss, arguing these new examples failed to plead materiality and falsity. Further, it argued the later agency provided the accompanying invoices to plead particularity. The later opposed this motion to dismiss, but also filed another lead to amend the complaint to add these invoices to just address that particularity issue. The district court did accept the invoices to address the particularity issue, but it did not find it in favor of the later's unmateriality and falsity issues. Therefore, it said that the amended complaint was futile, and we believe that this was an error. So, the first issue is on this question of materiality and causation. So, we believe that the district court errored in finding that the later's complaints did not adequately guide them. This is a quote from the opinion that Wolf Creek's cost estimates were material and caused the government to pay more money to Wolf Creek than it would have paid had it known the true labor costs. So, in these FCA fraud and inducement cases, causation and materiality are pretty intertwined. Some cases have them as one element, some cases have it split up. The reason they're intertwined is that a materially false statement, by definition, induces government reliance. And then, this reliance causes the government to pay more than it would have if it relied on the true consent. So, I think the key, you know, when it comes to these two factors, the key issue is reliance. It needs to be shown with a group vote. Can I ask you, what is the causation for the inducement? It seems strange to say that charging what you claim to be ridiculously high labor costs caused the government to enter into a contract for those labor costs. It's usually you under, like the underbid cases where you say it's only going to cost this much, and that's what induces the contract, when it turns out, after the fact, the costs are much higher. It seems stranger to think that the government, with the higher costs, is like, oh, yeah, this is ridiculously overpriced, so I'm going to enter the contract. But that seems strange to me, so I wonder if you could talk about causation and inducing the contract. That's a good question. I think the difference is just understanding the context of the contract structure, just to get a better view of it. You have a base contract where Book Creek has agreed to provide maintenance generally for the entire facility, and they've paid a certain base amount, and that's a big part of the contract. Then there's what's called an IBIQ contract. These are where there's smaller jobs that cannot be predicted in the base contract that are awarded kind of on an ongoing basis. Well, typically, you would have the government would put out a bid to multiple people, and there would be a price competition where then the incentive would be to underbid in order to get that contract. Well, in this case, it's one person getting the bid. It's only the person with the base contract, owner of Book Creek. So it's incumbent upon them to tell the government how much it's going to cost. That's the way it's structured, is that the government says, do a job, or they say, this job needs to be done, and then they say, we think it's going to cost X amount of money, and then it's up to the government to negotiate it down, accept it, or reject it. But our contention is the causation comes from the government relying on those cost estimates because the government relies on the expertise of the contractor to know how much that these jobs are actually going to cost. Could I ask a clarifying question? It strikes me that you've described something that is outrageous if it's what is going on, which is that estimates widely exceed how much time or what kind of work is going to have to be done. In order to do this project, we have to have 50 people working 50 hours, and no one in his right mind would spend that much time and that many people on the project. So in a sense, it's not the cost estimate, it's the work estimate that's being misrepresented. Your argument kind of loses force when you say the cost is, but it's the work estimate that's being misdescribed according to your theory, or am I missing your theory? When you stated the theory a minute ago... I'm not sure if you mean what they propose to do, or how much hours they actually propose to assign to a task. We're talking more about how many employees does it take to screw in a light bulb. Well, it's probably not going to take very many, but Wolfe is going to say it takes four or five, and they're going to take a long time to do it. That way they can increase that labor cost as much as possible to get the risk shifted to the government. So in that example, the fraud, if there is, and the misrepresentation, is in how many people it actually takes to screw in the light bulb. To say it's because it's... How many people does it actually take? Right. They know what it would... Right. They're the experts, they've done it a whole bunch of times. They know what it actually is going to take them. But they fraudulently misrepresent that it's going to take more people, more time than it really would. Right. All I'm saying is your argument would cohere a little better if you characterize that as a misrepresentation as to the work that's required, instead of saying a misrepresentation as to the price or the cost, because you can charge a lot for that. The misrepresentation that you're alleging is in the nature of what's being contracted for. Or do I misunderstand your argument? No, I think you're correct. I just think that one never leads to the other. Well, yeah, but when you state it the other way, it sounds incoherent. Then it's going to result in a higher labor cost. And so now here's my question. May I ask a follow-up question? May I ask a follow-up question? In order for you to state a claim, you've got to state, because it's a fraud claim, you've got to state with some particularity at least some examples of where this happened. And for you, in this case, I'm assuming those come from the second amended complaint. Is that correct? Yes. Okay. If it comes from the second amended complaint, I see two kinds of examples. So they both come from the second amended complaint. Is that correct? Yes or no? All right. So I want to look at those two things. One of them is a bunch of statements like, we typically overcharge. I'm not finding that to be a very particular example. Your Honor, that part of the complaint is not the reference. All right. So the other example is this. That's just a general allegation. Okay. Just showing the general scheme of fraud. Fine. Just to get an idea of how it works. Fine. The specific example is the GVIS lab example. All right. Which is later in the complaint. And that is a pretty good one where it actually has all popped up in itself where they're stating that it's going to take 80 hours or two weeks. But just put three pieces of drywall to a wall. And also that it's going to take 16 plumber hours to do a job. That doesn't require anything in the moment either. But basically we get down to that. Pardon me. That's frustrating. That job does not entail that. Yet the government accepted that request and awarded the contract with the exact same amount of money. So we believe the government's a liar in that false proposition. I'm trying to narrow the issues a little bit, if you will. We're down to that one example then. Is that correct, yes or no? I mean, there's a couple other examples. What's the next best example in one sentence? Is there anything else other than that in one sentence? Yeah, there's a second example which is going over a painting project. A painting project. That actually has a false bid on it. And then there's about three or four other examples going over it, other carpentry painted related examples. And then I think there's one that's a plumber. Which is the strongest in that? All right. Well, then let's look at the first one. What do you – what is your evidence that you – Much more specificity in the first two. In your strongest example, what is alleged that in three sentences shows that this is too high? So in the first example, the strongest example, the job is to put three pieces of drywall where there used to be wire mesh. To drywall an entire room from a regular carpenter is not a very extensive job at all. And to just drywall a small part of a panel is not an extensive job. Today, the Wood Creek estimates that it takes two weeks, 80 hours, for a carpenter to do a job that can usually be done in a day, if not two, for a typical German carpenter. Where in your contract – your two sentences are up. Where in the contract does it say that it only takes – where in your complaint, I'm sorry, does it say that it would only take one day to do that job? In the representative example section, each one states – Where's that? What the job would actually take. I understand. Where is the evidence that it would actually take much less? I'm looking for it. It's got to be specific, right? They say 80. You say 8. I see where they say 80. Where do you say 8? In the complaint. In paragraph 57, that describes what the complaint, what is being alleged, what is being cost, and then underneath of it, it provides an actual estimate. In this one, it says, carpenter removed wire at the top of the wall, takes one hour to work, replaced with drywall, four hours to work, and takes the wall two hours. So that's the estimate that we believe that it would actually take. Where is that? Number 50? What paragraph? The discrepancy is where the falsity is. 57. 57. Thank you. I'll look at that. You're saying that we're... It says what they... I'm reading it now. It only goes on for a few... No, it's there. It's 57, second-ended complaint. It says what they asked for. Where does it say what it actually would require? Oh, I see. The worker only required the following actions. Two, two, and zero. So that's where you allege the truth is. Is that the idea? No. Okay. So the discrepancy between the truth and the false cost estimate is where falsity is pled. And then the materiality portion comes when the government relies on that cost estimate and then awards a firm case contract, which it did in this case, for the exact amount of the cost estimate. And when you say a plumber is not required, you just say that as ipsy-dixit in the complaint, or do you say someone looked at it and said it? When you look at the actual work description, which is attached as an exhibit, there's no mention whatsoever of anything that requires a plumber. It's an HVAC, and a carpenter person would be the only two people that would do work on this type of project. That's the answer to my question. Thank you. I just want to ask one other thing. You said that they give the estimate, or they say this is how much it will take, and then they submit the bills. But you implied that there's supposed to be an adjustment if it takes less time, but that's not my understanding of the arrangement. I mean, the amount is fixed once the proposal is accepted, whether it ends up higher or lower, right? Yes, you are correct. That is how the arrangement works, and that's why it's a fraudulent inducement theory. So the idea is that the cost estimate induces the government to award a co-fixed price higher than it would have if it was based off the truth. If it was based off the truth, then the price would have been a lot lower, and there wouldn't be this gap that's going to allow Wolf Creek to exploit that price. When Wolf Creek puts a higher cost estimate, it gives its employees cart launch authority to just bill fake hours against Wolf Creek. Wolf Creek doesn't get any of that cost because it's getting a higher price from the government. Thus, it's shifting that risk of cost overrun and fraud to the government, not to itself, which totally upends the entire way that this contract is supposed to be structured. It's supposed to be protecting the government from this type of risk, not exploiting it. But isn't... I'm curious how far your argument goes, because it does still shift the risk. What the government has guaranteed is the total price that it accepts, and the government is locked in on that price, and it can't go above that price, even if things happen like asbestos in the walls or other things where it's going to require a whole bunch of more work. So why isn't it... I would think that any reasonable contractor, knowing that they are going to bear the risk of unexpected costs, is going to work in maybe more than the average hours because that risk is on them, and the government is free to reject it if the government thinks it's too high. But I don't necessarily see it as wrong that because they bear the risk, they think that they should include more hours. But under your theory, would that be considered fraudulent? It's a question of degree. So the idea of reasonably coming to what you think the hours will be and then padding it just to account for some risk is something that is common in the trade and can be acceptable. We're talking about factors here that are two, three, or four times more than the actual cost. But that's the problem. Why isn't the government... Knowing this honesty is what turns it into fraud. But the government has its own experts. I'm not saying that if it was something that was in good faith, that they'd believe it, just pad it and worry about it. The government has its own experts to review these contracts and can consider whether it's padded too far. Was there any contractual provision in the overarching, the really big contract, that suggested that there was any type of fiduciary obligation on Wolf Creek to ensure the government was relying on its expertise in determining the hour labor estimates for these types of projects? Or is it just an arm's length exchange where the government looks at each individual thing, has its own experts look at it, its experts say it's reasonable, and then respond in kind? Or can you point me to any provision that suggests that they, as part of a broader contract, they agreed to, or the government agreed to rely on Wolf Creek's expertise? There's not a specific fiduciary relationship created through the contract. It's more based off of the structure of the contract, of how it is structured and how the regulations are structured to allocate risk. But I will say, too, when it comes to case law, when it comes to whether the price competition, whether the government can look through price competition or pricing data to verify these cost estimates, this court in the United Technologies has held that that's irrelevant to that. It states explicitly, the False Claims Act makes an individual liable for presenting a fraudulent case to the government regardless if the government decides to take the claim based on price competition. And this was about a cost estimate case. So in that cost estimate case, the government had the chance to verify this well, but they still held that it was material, it was false cost estimates, and it caused the government damage. So I don't think that just because the government has an opportunity to review it doesn't absolve the kind of workpeople liability on that part. Thank you. You'll have your rebuttal. I think it might be right at the time. I think my clock is not... No, you're... Yes, you've expended your time. So... And then the last issue I wanted to address, too, was this idea of... No. ...the government learns after... Yes. Counsel, you'll have your rebuttal time, but your time is up now. Oh, I'm sorry. I didn't... It's difficult. I understand. Yeah, I think the clock on my side didn't actually end up going, so I wasn't quite sure what to say. Can you start the clock? Good morning, Your Honors. This is Phil Kushner on behalf of the Academy. Can you hear me? Yes. I don't think he can hear you. Your Honors? Yes. Can you hear us? Good morning. This is Phil Kushner on behalf of the... Can you hear me? We can. Can you hear us? Yes. Pretty well. Thank you. Since January 2017, the Relator has been telling the government that Wolf Creek is engaging in ongoing massive fraud by submitting proposals for contracts that contain inflated labor estimates. Now, what has the government done in response? It first investigated for three years and declined to intervene. Then it continued and substantially expanded its contracting and awarding of contracts to Wolf Creek, including extending the master contract that it has with Wolf Creek. And let me add, just as an aside, there's nothing in the contract that precludes the government from seeking bids from parties other than Wolf Creek. Wolf Creek does not have a monopoly on this work. It has to submit proposals, which the government reviews, negotiates, is free to accept and reject. And what the government has done since January 2017 when it first learned of this allegation of an ongoing fraud, it has paid on every single representative example that the Relator identifies in every single one of the iterations of its complaint. It has awarded hundreds of additional contracts worth millions of dollars, including over $2 million in contracts since the initial complaint was unsealed in December of 2019. It has continued to use the exact same process that the Relator continues to challenge, whereby it requests a proposal, if the government experts review it, they negotiate it, agree to a fixed price, and what else has occurred? I want to point out, it's not uncommon for the government, even when it hasn't appeared to be, to seek to file an amicus brief to be heard on appeal when it disagrees with the district court's decision dismissing a case or its application of the law. The government hasn't done that here either. And that's because the district court correctly denied Relator's motion to file a second amended complaint based on futility. It dismissed the first amended complaint, Relator doesn't appeal from that decision, and what is the significant difference between the first amended complaint and the second amended complaint? This is important. In the second amended complaint, the Relator removed the allegation that the government was unaware of the falsity of the Relator estimates. That's because the government knew that the Relator was making this allegation as known since January of 17. The second amended complaint, like the first, also submitted substantial evidence, 1,400 pages of attachments to the complaint, which established that the government's conduct is unchanged after learning of the allegation, that two-thirds of the contracts that the Relator challenges have been awarded since it was told of this allegation, and also submitted materials that show that the vast majority of the time, the government does not accept Wolf Creek's proposal. It negotiates, and they arrive at a different price. By comparing some of the exhibits that the government, I'm sorry, that the Relator submitted, and we put this in our brief, only 20 of 152 proposals were accepted. All the rest were negotiated, leading to a fixed price, which, as one of your honorees pointed out, Wolf Creek is accepting the risk that its estimate may be wrong, and it's going to be stuck with the price that it agreed to. In the False Claims Act area, there are high pleading standards, particularly where there is a claim of fraudulent inducement, which Relator has migrated to that theory over its different iterations of this contract. The Supreme Court in Escobar describes the pleading standard for materiality as being demanding and rigorous, and able to be determined on a motion to dismiss. And it specifically says, has said that where government conduct is unchanged after it learns of the alleged violation of this contract. This is strong evidence that it is not material. The District Court correctly found that the Second Amendment complaint did not meet the pleading requirements for materiality under Escobar. That the undisputed evidence that was submitted to it established that the government did exactly what Relator said it would not have done if it had known of the alleged inflated labor estimates. It paid the claims, entered into new contracts, hundreds of them, and extended the master contract. For these same reasons, Relator is unable, is fatal to, plea causation. Once the government is unnoticed that, at least according to Relator, the labor estimates are inflated, it can't be that the labor estimates cause it to enter into the contracts. Every single iteration of the complaint that Relator has filed alleges that the government reviews and negotiates the contracts with Wolf Creek. The contract that is attached to the Second Amendment describes in detail the process by which the government reviews and negotiates the regulations that we cite in our brief. I'm sorry. I mean, just hypothetically, okay, there's, uh, let's say hypothetically, the practice is that the estimates are grossly inflated. So much so that once they're slashed in a half, they're still grossly inflated. And the way they make these proposals is by inflating the number of hours that are necessary. And they just flat out, you know, they give an estimate, they're flat out lying that this is going to take 50 hours, and then the government comes back and says, no, we think it should be half of that, and so they say, okay, and time after time they're finishing up in five hours, two hours, one hour. And this is, this is the pattern, and the government, yeah, they don't change it because they apparently don't know better. That hypothetical, could, could that be a violation of the statute? Once the government has been told that the labor estimates are inflated, and it cannot be, it goes forward within contracts with Wolf Creek, it cannot be, it's not going to be relying on an estimate that has been told is false. It would not be material, it would not cause it. But counsel, your answer assumes that it's not false. I mean, your answer just sort of un-asks the question. I mean, the idea is that there's been some misleading going on. If they say, we estimate this as 150 hours, but it's not really 150 hours, that's not very misleading. The idea that I undertook, Judge White to be asking is, what if they actually mislead on a regular basis? I'm sorry? Let's assume that they're overstating their hours grossly, and the government is told their estimated hours are grossly overstated. The government doesn't get told, that's the whole idea. The government now knows that their estimated hours are grossly overstated. We know that the government reviews and negotiates these. How could the government ever, if it's been relying on their estimated hours, be told that it's grossly overstated? Let's talk about the time period before they knew. That would be before January 2017. Okay. But, every representative example that the relator alleges is after that. And, Mr. Trombey, he accurately described the progress of the pleadings, and the fact that contracts being challenged expanded substantially after the government was told. Okay, so you're saying you could never have a situation where the government doesn't change it, and there's still a violation. But we know that there are times when the government doesn't pursue it, and other people do. I mean, it's almost, I mean, it's sort of circular to say that whenever the government doesn't jump up when they find out, there's no cause of action. We're not just talking about jumping up. We're talking about paying on the contract, entering into new contracts, extending and expanding the contractual relationship. We know that the government has experts who are reviewing and negotiating these contracts, and once they're told that the labor may be inflated, they don't. So let me ask this then. Your opposing counsel says the strongest example he has is on paragraph 57 of the second amended complaint. And he alleges that the labor hour estimates were 80 carpenter hours and 16 plumber hours, and that the work order only required two hours, maybe four, and zero plumber hours. Now is the idea that you're giving is that when the government, let's take both examples. One is the government thinks maybe it will take 80 hours and involve the plumber. Then the government's been misled, right? Or, I guess what you're saying is the government knows that it's not going to be 80 hours, they're just willing to accept it anyway, which seems counterintuitive. Maybe it's true that the government does stuff like that, but it's pretty counterintuitive. How should we, I mean, without depositions, just based on the complaint, how should we conclude that this isn't within the scope of the False Claims Act? That's my question. Here you have allegations that are contradicted by the attachments. So let me explain. Please. Below, the relator told the district court that in fact this job only took one day and cited to an exhibit. And when you look at the exhibit, it shows the job actually took six weeks. Well, I've looked at those parts of the record and I don't get, I've looked at some of that part of the record. There's this dispute over whether it actually took six weeks. Nobody in his right mind thinks it took six weeks. And the explanation that's given is that that's just the period in which this was done. Not that it took that many hours. You could do all of this in one day if you had several people doing the work. You could do 80 hours in a day if you had 10 people doing the work. It isn't the amount of time that the project takes. It's the amount of hours that are expended. So I'm not getting too much information from these parts of the record which talk about when it began and when it ended. Are you with me? So which of my two hypotheticals... I'm sorry, Wolf Creek proposes to do... Could you answer then, what's the theory? ...complaint and the contract shows that the government reviews and negotiates and has accepted this. So is the theory that the government didn't mind that they were being charged 80 hours for eight hours of work? Or is it that they're corrupt and we don't worry about it? Or that they're wrong? What's the underlying theory? You say, this is the fact, is they knew, but they did it anyway. That's a little bit counterintuitive, isn't it? Actually, I think the... First, if you trace this through, you see that there were two options as to what the work was going to be. It's not just putting up the drywall. There's also ductwork that's done and the proposal describes how there's a possibility that the ductwork won't be able to be put into that location. Where is that? Is that in the record? There's a lot of unknowns that are going on and so you arrive at a price that seems to capture the knowns and the unknowns. Is that in what we have before us or do we need a deposition to clear that up? No, I think there's other documents that have been submitted on this particular job. Well, maybe you could point us to them right now. Because it'd be interesting. It's also the ductwork. The possibility of having to relocate the ductwork, which by the way, you could see that there'd be plumbing issues if there's plumbing in the way of where the ductwork has to go. That would be very strong for your case if you told us where... Council, council, council. After the government knows. I'm sorry. That would be very persuasive to me in your case if you could show us where in the record that is. You say that's in the record. The ductwork and all that stuff. I'm sorry, Your Honor, which part? What you were describing for the last three minutes. I would direct you to... in our agreement on page 35, but it's page ID 4615 and that has the full description of what the job entailed, including in bold letters, field verified that ductwork can be installed in proposed location. And we didn't attach the diagram, but there's a diagram that goes along with it. Okay, thank you. That's helpful. Also, I direct you, Your Honor, at page 34 of our brief, you'll see the picture that the relators submitted describing the work. And you'll see both... Actually, I don't even want to get into that because that wasn't the job that was... I looked at the pictures and the pictures didn't help me very much. The accurate description, which is on page 35 of our brief. I'll look in the record. I didn't find too much from those pictures one way or the other. Well, the picture's the problem. The picture's related to an option that wasn't the one that was selected. So it really has nothing. The accurate description of what was agreed to is on page 35 of our brief. And you can see that it's more than just putting up some drywall, filling in three holes. It involves installing ductwork also with the uncertainty of knowing whether the ductwork would be put in the proposed location. And might involve plumbing. Yeah. And by the way, again, this is an unusual piece in that so much evidence was submitted to the district court. And one of the pieces of evidence is the actual proposal. And there's no concealment. There's no hiding the fact that there's included a line item of $885 for plumbing. It's right there. You know, so... And finally, there's no dispute that the government experts who have access to this massive database of pricing information, it says so in the contract, it's referred to in the plan, are doing their own assessment and evaluation. And as Judge Murphy alluded to, which involves an assessment of unknowns, unpredictabilities, and the decision about what seems to be a fair price given the work to be done and the unknowns. I don't have anything else. Questions? Thank you. Thank you. Thank you. Thank you. Okay, I believe I have five minutes for rebuttal. Okay, so I'll address three things, and I think this will help a lot. One is to understand what the strategy behind this fraud was. There's a quote from the reporting conversation that's in the plan, that the idea was to flood the customer with quotes, meaning that these guys, these union guys, would go around looking for a bunch of jobs that could be filmed, and flood the mass of people with these quotes, these false estimates, knowing that a large majority of them would not get funded, would not get approved, because the government didn't have the money to do it. But they did that to try to get it passed, to try to get over the government's verification process. It was part of the scheme. So when the respondent talks about, oh, they didn't accept the vast majority of these at the exact same price, they didn't because they were flooding the box. There was a lot of these going through. That was part and parcel of the fraud. The second misconception is this idea, this speculation, in fact, that the DOJ, just because the narrator tells the DOJ something, that that automatically imputes knowledge to both NASA and the particular person at the particular time about these contracts. We have no idea about the depositions of the NASA contract officers in charge of acceptance. We did not know. And further, what was disclosed in 2017 was about past fraud, about past fraud implications. There's no way to tell the government about the future of fraud. We don't know if it's going to continue after the date, if it's going to stop one day or not. There's no relation between these two, between talking about past fraud and the future. Every single firm-fixed contract is a new fraud-in-the-inducement theory, is a separate decision in its own universe. And I don't think without depositions, without further estimate, that we can't tell whether or not the government had actual knowledge. And also, I think, as the clerk pointed out, it's highly implausible that they did. Do we just think the government knows that they're being defrauded and they just accept it and are fine with that? That seems more than plausible. And finally, they talk about, oh, the government didn't do anything to stop this because they didn't extend the contract or stop this. We're talking about thousands of dollars per firm-fixed contract, an individual decision, in comparison to a multi-million dollar base contract that's the entire maintenance of a multi-billion dollar GRC-cleansed NASA system. You think NASA is going to upend and disrupt all its operations over one firm-fixed contract or even more on an individual basis? It has a lot to consider. It's going to lose money on other ends, but that doesn't excuse fraud, just because NASA makes the strategic choice not to extend a contract. And plus, once it's in, it extends that base contract, well, it's stuck with the IDIQ at that point because the IDIQ contract is exclusive. It does say that we'll create these people who get these contracts, these firm-fixed ones. They're the part. It's a one-on-one relationship. And honestly, even if it isn't, it's not efficient for them to go outside and they have maintenance workers and hardware workers in-house. It doesn't make sense. So the government, yes, did the government not keep extending the contract? Did they keep on paying some of these claims? Yes, but they had to keep operating. And the DOJ doesn't pursue every single case. Just because the DOJ doesn't pursue doesn't mean that we should just say it's all non-material. That would just defeat the entire purpose of this act. So I think that the respondents whose arguments on this are misleading do not really get to the materiality issue. And honestly, we make dangerous precedent towards the private legates who do this act. We try to pursue, on behalf of the government, fraud against the taxpayers. The government is not always the best custodian of the resources of the taxpayer, and I think we all know this. So there's more to it. And the final thing I'll say is, on the record, on this plumbing, when you look at the record, it's pretty clear. There's an exhibit attached. It has two proposals. It has two alternatives, and it is selected one. And the one only mentions filling in a certain drywall area, which is the picture that was provided, which shows what we're looking at, the small amount of space we're looking at. And then it provides a blueprint showing the ductwork that needs to be done. Well, I'm not talking about the ductwork being overinflated, which it probably is, but I'm really pointing at this carpentry work, because that's where Santillo, the main dealer here is, that's where he's making his heads, on this carpentry work. And so that's what we're saying is hugely exceeding and it's very clear. And then there is nothing, there's nothing mentioned in that about plumbing. And so I don't think that the court can, or the respondent can speculate that there's plumbing when there's no mention of that whatsoever in the record, and that speculation defeats the inference that should be towards the real thing. Thank you.